IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

      Lee E. Chapman,           Case Nos. 18-30442-beh
                                           19-22820-beh
                                           19-26731-beh

                     Debtor.         Chapter 13

## DECISION AND ORDER ON DEBTOR'S MOTIONS TO EXPUNGE/SEAL BANKRUPTCY RECORDS

      The debtor chose to delegate her financial affairs to her adult daughter via a durable power of attorney. Several years after she delegated that authority, her daughter filed bankruptcy on behalf of her mother, but without her mother's knowledge. Now, the debtor-mother asks to have the records of those surreptitious bankruptcy filings expunged or sealed. But because they fall within the broad scope of the POA authorization, and are neither scandalous nor defamatory, the Court must deny both requests.

### FACTUAL BACKGROUND

      After the death of her second husband, Lee Chapman decided to pool resources with her daughter, Holly Olm, and share a household and finances. On January 21, 2015, she signed a Durable Power of Attorney for Finances and Property (POA) giving her daughter certain authority over Ms. Chapman's

financial affairs. ECF Doc. No. 58, at 4–11, Ex. A.[1] She testified that Holly paid the household bills and was responsible to pay the home mortgage with Nicolet National Bank each month. Holly would give her some receipts, which Ms. Chapman maintained in files she kept. Ms. Chapman produced some of those mortgage receipts, dated March 30, 2018 through July 1, 2019. ECF Doc. No. 58, at 12–27, Ex. B. They purport to show monthly payments of $645.00, and a declining "ledger balance" with no assessment of interest, despite the fact that the mortgage documents show an annual interest rate of five percent. *Id.;* Case No. 18-30442-beh, ECF Doc. No. 17, at 3. The name of the bank employee serving as "transaction directive" is identical on every receipt for that sixteen-month period.

Ms. Chapman testified that she never had any reason to question her daughter, did not check her bank account balances, did not collect the mail at the home, and relied on Holly fully to manage the family finances and home. ECF Doc. No. 43, at 5; *In re Chapman*, 616 B.R. 523, 528 (Bankr. E.D. Wis. 2020).

Ms. Chapman eventually learned Holly filed three bankruptcy cases in her mother's name over the course of a nine-month period. Ms. Chapman testified that she did not give Holly permission to file any bankruptcy case in her name. ECF Doc. No. 58, at 2, ¶ 16. She learned of the three cases, and of a

---

[1] All citations are to docket items from the most recent bankruptcy case, No. 19-26731-beh, unless otherwise noted.

pending foreclosure action, only after a social worker came to her house on July 23, 2019 to discuss that there had just been a sheriff's sale of Ms. Chapman's home. *Id.* at 1, ¶ 7.

## A. First filing, November 2018

A brief history of the filings is taken from the docket in these cases.[2] Ms. Chapman's first Chapter 13 petition was filed on November 6, 2018. Case No. 18-30442-beh, ECF Doc. No. 1. The first bankruptcy counsel filed a request on November 19, 2018 to extend time to complete schedules, because Holly Olm, the POA for the debtor, had to cancel two appointments with counsel based on having been stricken with pneumonia. *Id.*, ECF Doc. No. 8. Holly is listed as a co-debtor on Chapman's home mortgage. *Id.*, ECF Doc. No. 12, at 18. The Chapter 13 trustee's docket entry on January 3, 2019 notes a continuance of the 341 meeting of creditors, and states "[d]ebtor appeared." The docket entry for February 7 notes "Meeting of Creditors Held and Concluded. A Motion to Dismiss will be filed. Debtor absent." The case was dismissed on March 13, 2019, shortly after the Court had granted a motion to lift stay in favor of Nicolet National Bank. *Id.*, ECF Doc. Nos. 26, 29. The motion included a ledger showing no payments of the $644.18 monthly mortgage amount for the months of November and December 2018, and January 2019. *Id.*, ECF Doc. No. 17, at

_____

[2] The Court can take judicial notice of its own docket. *Tuttle v. Educ. Credit Mgmt. Corp. (In re Tuttle)*, 600 B.R. 783, 789 n.2 (Bankr. E.D. Wis. 2019).

16. The Bank's proof of claim showed $9,469.32 in pre-petition arrearage. Case No. 18-30442-beh, ECF Claim No. 4-1.

**B.     Second filing, April 2019**

A second Chapter 13 case on Ms. Chapman's behalf was filed on April 2, 2019, two weeks after the first was dismissed, by the same bankruptcy counsel. Case No. 19-22820-beh, ECF Doc. No. 1. Counsel also submitted a motion to continue the automatic stay, including an affidavit signed by Holly. Her affidavit stated that the last case was dismissed due to her sickness and disability, but that her condition had improved and also that her brother, Brad Olm, had indicated a willingness to assist with the case. *Id.*, ECF Doc. No. 6, at 5. The Chapter 13 trustee objected due to the lack of schedules, a Plan, and a corroborating affidavit from Brad Olm. *Id.*, ECF Doc. No. 7.

Nicolet National Bank also objected to continuance of the automatic stay. *Id.*, ECF Doc. No. 8. The Bank noted that it had begun foreclosure proceedings before Ms. Chapman's first bankruptcy case, and a sheriff's sale had been set for November 7, 2018, but [Holly] filed the first case on November 6, putting a stop to the sale. *Id.* After receiving relief from the stay in the first case, another sheriff's sale was set for April 3, 2019, which also was halted due to the second case. *Id.*

The Court held a hearing on the motion to continue the stay. Holly did not appear, and her counsel relayed that despite promises by Holly, he had not been contacted by Brad Olm about any assistance in the case. Lacking any

evidence of debtor's financial ability, the Court denied the motion. *Id.*, ECF Doc. No. 19. Neither Holly nor Ms. Chapman appeared at the meeting of creditors on May 2, 2019, and the case was dismissed on June 5, 2019. *Id.*, ECF Doc. No. 26.

## C. Third filing, July 2019

A third bankruptcy case on Ms. Chapman's behalf was filed on July 10, 2019, using different bankruptcy counsel from the prior two cases. Case No. 19-26731-beh, ECF Doc. No. 1. The next day, Nicolet National Bank filed a motion to confirm the absence of the automatic stay. ECF Doc. No. 6. For the reasons more fully explained in the Court's decision at ECF Doc. No. 43; *In re Chapman*, 616 B.R. 523, 525 (Bankr. E.D. Wis. 2020), the Court granted the Bank's motion to confirm the absence of the stay, as well as sanctions against counsel. Holly did not provide an affidavit in this case in support of imposing the automatic stay, and she did not pay the case filing fee, which led to the case being dismissed on August 15, 2019—prior to the first scheduled meeting of creditors. ECF Doc. No. 31.

Holly resigned as Ms. Chapman's agent on July 26, 2019. ECF Doc. No. 58, at 2, ¶ 20.

## D. Post-bankruptcy motion for expungement, November 2020

On November 18, 2020, Ms. Chapman, through new counsel, filed Motions to Expunge/Seal records in all three of her bankruptcy cases. Case No. 18-30442-beh, ECF Doc. Nos. 36, 37; Case No. 19-22820-beh, ECF Doc.

Nos. 34, 35; Case No. 19-26731-beh, ECF Doc. Nos. 51, 52. The Court received testimony of Ms. Chapman and Brad Olm during two hearings and via Ms. Chapman's unsworn declaration. ECF Doc. Nos. 38, 57, 58. Her daughter, Holly Olm, never appeared in Court.[3] No interested party objected to the request for expungement.

Ms. Chapman testified that as a result of the three bankruptcy filings in her name, her credit score has been affected negatively. ECF Doc. No. 58, at 2, ¶ 21. She described that after the foreclosure on her home, she needed a co-signer (her son, Brad) to rent an apartment. *Id.* at 3, ¶ 22–23. She testified that having the bankruptcy cases on her credit record has meant, among other things, that she was charged a higher premium for her renter's insurance, was denied a cell phone contract, and was ineligible for a payment plan for some needed dental work. *Id.* at 3, ¶ 24–25. In these changed living circumstances, she has felt a sense of embarrassment and loss of dignity. ECF Doc. No. 56.

Brad described his efforts to investigate his mother's financial situation beginning in late July 2019. He acknowledged that the fact she is now not living in her own home but renting an apartment is "not as a result of the bankruptcies themselves, but the whole process." ECF Doc. No. 56.

After the hearing, Ms. Chapman filed a copy of the January 21, 2015 Durable Power of Attorney, attached to her amended declaration. ECF Doc. No.

---

[3] Ms. Chapman's new motion counsel explained that her client would not be pursuing a civil suit for damages against her daughter, as Holly is terminally ill and deemed uncollectible.

58, at 4–11, Ex. A. The POA document states in pertinent part, beginning with

an introduction:

> My agent may perform for me and in my name and on my behalf
> any act in the management, supervision, and care of my estate and
> affairs that I personally have authority to perform, subject to the
> limitations provided in Section 19, below. Except as otherwise
> herein limited, my agent may exercise for me and in my name and
> on my behalf the powers enumerated below, including the powers
> enumerated in the Uniform Power of Attorney for Finances and
> Property Act in sections 244.41(3) and 244.43 of the Wisconsin
> Statutes and the specific statutory powers in corporate by
> reference in this instrument.
> . . .
> **12.    CLAIMS AND LITIGATION**
> My agent shall have all the authority granted under section 244.52
> of the Wisconsin Statutes with respect to claims and litigation,
> including without limitation the authority to demand and collect all
> property, real or personal, now or hereafter due, payable, or
> belonging to me; contest, compromise, settle, or abandon claims in
> my favor or against me; give receipts, releases, and discharges;
> commence, pursue, or oppose any action, suit, or legal proceeding
> relating to any matter in which I am or may hereafter be
> interested; and compromise, settle, or submit to judgment any
> such action or proceeding.
> . . .
> **13.    PERSONAL AND FAMILY MAINTENANCE**
> I intend to limit the application of section 244.53 of the Wisconsin
> Statutes to the powers expressly provided in this Section and
> otherwise in this instrument. . .
> . . .
> **19    LIMITATIONS**
>     **19.1 Limitations: General.** Except as otherwise expressly
> provided in Section 13 of this instrument, my agent shall not
> exercise any power granted by this instrument in favor of my
> agent, my agent's estate, my agent's creditors, or the creditors of
> my agent's estate. My agent shall have not power to disclaim
> assets, to make gifts, . . .

*Id.*

**DISCUSSION**

Ms. Chapman's primary request is to expunge the docket in her cases "either such that her bankruptcy filings will no longer be visible to the public or such that her bankruptcy filings will be amended so that anyone who views it will conclude that the filing should not be taken into consideration when assessing her credit risk." ECF Doc. No. 52, at 7.

Expunging a bankruptcy case is a rare event, to be exercised with the greatest of prudence. *In re Buppelman*, 269 B.R. 341, 341 (Bankr. M.D. Pa. 2001). What is becoming far from rare, however, is the use of durable powers of attorney. *Russ ex rel. Schwarz v. Russ,* 2007 WI 83, 302 Wis. 2d 264, 734 N.W.2d 874. In that case, former Chief Justice Abrahamson described the uses and risks of such vehicles:

> A durable power of attorney, unlike the common law power of attorney, survives the principal's disability or incapacity. In fact, "[d]urable powers of attorney are intended to give competent individuals the ability to delegate to an agent broad powers to manage their affairs and assets in the event of incompetency." The durable power is a very useful tool for many persons and for many circumstances. . . . A durable power of attorney can help a competent principal to handle his or her financial and legal affairs and living arrangements and can then enable the attorney-in-fact, the agent, to handle the principal's finances and day-to-day quality of life without having to declare the principal incompetent . . . These durable powers are drafted to enable the agent to handle a range of matters, including enabling the agent to do everything that the principal could individually do. . . . A study by the AARP in 2000 found that 45% of Americans age 50 or older reported having executed a durable power of attorney, representing a large increase in the prevalence of durable powers from a decade earlier.
>
> The durable power of attorney has been appropriately characterized as "a simple yet powerful tool" But it is at the same

time a troublesome document, creating the potential for abuse. By merely signing a durable power of attorney, a principal may give an agent tremendous power, including the power to sell the principal's home and any other assets, to make investments, to cancel insurance policies or name new beneficiaries, and even to empty the bank accounts.

2007 WI 83, ¶¶ 42-47 (Abrahamson, C.J., conc.) (internal citations omitted).

## A. Does the Durable Power of Attorney Validate a Bankruptcy Filed on behalf of the Principal?

"The validity of a petition is a threshold question in determining a bankruptcy's court's jurisdiction over a case." *In re Brown*, 163 B.R. 596, 597 (Bankr. N.D. Fla. 1993); 11 U.S.C. § 301. Ms. Chapman has brought into question whether the three cases filed in her name are valid. She did not offer any analysis of the scope of authority in the POA in her brief or at the expungement hearing. Instead, she argued that because she was not aware that Holly filed the bankruptcy cases, she did not authorize them. At the hearing, Ms. Chapman's motion counsel described that "state law" requires the authority to file bankruptcy be explicitly stated, but neither her brief nor the amended declaration accompanying the copy of the POA identified any Wisconsin authority on the topic. ECF Doc. No. 56. The Chapter 13 trustee counsel added, "that is what the trustee looks for," but did not cite caselaw or address the specific Wisconsin statutory provisions incorporated in the durable power of attorney which Ms. Chapman executed.

The POA executed by Ms. Chapman is written expansively. The POA document incorporates powers enumerated in the Uniform Power of Attorney

for Finances and Property Act, Ch. 244 of the Wisconsin statutes. The introduction incorporates the powers set out in Wis. Stat. § 244.41(3). That subsection reads:

> **(3)** Subject to subs.(1),(2),(4), and (5), if a power of attorney grants to an agent the authority to do all acts that a principal could do, the agent has the general authority described in ss.244.44 to 244.56.

Paragraph 12 of the POA incorporates powers under Wis. Stat. § 244.52, which reads:

> **244.52 Claims and litigation.** Unless the power of attorney otherwise provides, language in a power of attorney granting general authority with respect to claims and litigation authorizes the agent to do all of the following:
> . . .
> **(7)** Act for the principal with respect to bankruptcy or insolvency, whether voluntary or involuntary, concerning the principal or some other person, or with respect to a reorganization, receivership, or application for the appointment of a receiver or trustee which affects an interest of the principal in property or other thing of value.
> . . .

The POA specifically notes limitations in Paragraph 19, precluding gifts to the agent herself. Paragraph 12 of the POA, *Claims and Limitations*, begins "My agent shall have *all the authority granted* under section 244.52 of the Wisconsin Statutes with respect to claims and litigation, including without limitation, . . ." (emphasis added). Section 244.52(7) includes the authority to file bankruptcy petitions. While Paragraph 12 of the POA does not explicitly list bankruptcy petitions as one of the enumerated types of litigation the agent may pursue on the principal's behalf, the initial umbrella language "all the authority

granted under section 244.52" is a comprehensive grant of power that includes the bankruptcy-filing powers under subsection 244.52(7).

Indeed, if Ms. Chapman had intended to restrict her agent's powers in Paragraph 12, she could have used language similar to that used in Paragraph 13, *Personal and Family Maintenance*. In that paragraph, the POA diverges from the full range of authority described in the statutory model by stating: "I intend to limit the application of section 244.53 of the Wisconsin Statutes to the powers expressly provided in this Section and otherwise in this instrument." Taking the document as a whole, the Court finds that the agent, Holly Olm, was given authority to institute a bankruptcy petition on behalf of the principal, Ms. Chapman.

Even if the POA Ms. Chapman executed didn't so plainly capture sec. 244.52(7) of the Wisconsin Durable Power of Attorney statute, Paragraph 12 of the POA grants a general authority to litigate. A majority of courts considering the question have held that a POA which provides a general authorization to litigate includes the power to initiate a bankruptcy proceeding. *U.S. v. Spurlin (In re Spurlin)*, 664 F.3d 954, 959 (5th Cir. 2011) (finding a bankruptcy petition authorized, pursuant to a general power of attorney); *see also In re O'Connor*, Case No. 08–16434, 2009 WL 1616105, at *2 (Bankr. N.D. Ohio, Feb. 27, 2009) (collecting cases).

In sum, even if Ms. Chapman wasn't aware that these cases were being filed in late 2018 and mid-2019, she had given Holly Olm authority in 2015 to

file them. There is no evidence that Ms. Chapman took any steps to revoke that authority before July 26, 2019.

Satisfied that the Court had jurisdiction of these cases when filed, may the Court go further to consider the relief that Ms. Chapman seeks?

**B.    May this Court Grant Expungement Or Other Remedy?**

Ms. Chapman asserts that this Court has statutory authority either to expunge bankruptcy records under 11 U.S.C. § 105, or to seal the records pursuant to § 107. ECF Doc. No. 52, at 6–9. Section 105(a) of the Bankruptcy Code imbues the Court with equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 107(b)(2) permits the Court to "protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title."

### 1.    Equitable Expungement Is Not Permitted

Ms. Chapman acknowledges that expungement "is an extraordinary remedy that has not been ordered in the Seventh Circuit." ECF Doc. No. 52, at 1–2. Accordingly, she points to cases outside the Seventh Circuit to support her request. *See, e.g., In re Buppelmann*, 269 B.R. at 341 (remarking that expungement is authorized by the equitable powers implied under § 105); *In re Storay*, 364 B.R. 194, 196 (Bankr. D.S.C. 2006) (finding that cause existed to expunge the debtor's case pursuant to § 105). Relying on these cases and others, Ms. Chapman asserts that "[f]ederal courts, including bankruptcy

courts, possess the inherent power to expunge court records when such a remedy is necessary and appropriate in order to preserve basic legal rights." ECF Doc. No. 52, at 7 (citing, inter alia, *In re Whitener*, 57 B.R. 707, 710 n.3 (Bankr. E.D. Va. 1986) and *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 140–41 (2nd Cir. 2004)).

Ms. Chapman's argument, to the extent it hinges on the broad "inherent" equitable power of the Court to expunge records, is foreclosed by a recent Seventh Circuit ruling. *U.S. v. Wahi*, 850 F.3d 296 (7th Cir. 2017). In *Wahi*, the court applied *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994) to overrule its precedent holding that a court "has inherent authority to reopen a closed criminal case to consider a request to expunge the judicial record based on an equitable balancing test that weighs the public and private interests at stake." *Id.* at 298 (overruling *U.S. v. Flowers*, 389 F.3d 737 (7th Cir. 2004) and *U.S. v. Janik*, 10 F.3d 470 (7th Cir. 1993)). While Ms. Chapman's case is certainly not a criminal case, the Seventh Circuit's reasoning and holding nonetheless apply to any request for equitable expungement here.

The *Wahi* court begins with the long-standing principle "[f]ederal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." 850 F.3d at 299 (quoting *Kokkonen*, 511 U.S. at 377). Where there is no explicit expungement authority, a court's only source of jurisdiction falls to "ancillary

jurisdiction." *Id.* at 300. There is no dispute that the Bankruptcy Code does not supply explicit authority for expungement.[4]

Ancillary jurisdiction allows "federal courts [to] have a limited inherent authority to assert jurisdiction 'over some matters (otherwise beyond their competence) that are incidental to other matters properly before them.'" *Id.* (quoting *Kokkonen*, 511 U.S. at 378). Further, such jurisdiction may be exercised for only two purposes: "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent, and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Id.* (quoting *Kokkonen*, 511 U.S. at 379–80).

Assessing whether a court may expunge (criminal) records on purely equitable grounds, the *Wahi* court first found that expungement "is not factually dependent on the underlying [] case . . . Instead, it will always turn on facts collateral to or arising after the case is over—in short, matters external to the [] case itself"—for example, a defendant's inability to secure professional

---

[4] This lack of authority for expungement is in contrast to the express authority to seal records from public view under § 107(b) and Fed. R. Bankr. P. 9018. *See infra* Sec. B.2. While some courts use the terms "expunge" and "seal" interchangeably, the two acts have different standards and effects. This Court understands expungement to mean the complete removal of a bankruptcy case from court records, as if the filing never happened. *See, e.g., In re Joyce*, 399 B.R. 382, 385–86 (Bankr. D. Del. 2009); *In re Buppelmann*, 269 B.R. at 343. Sealing, on the other hand, refers to the restriction of access to papers filed in bankruptcy cases and the dockets of a bankruptcy court, under 11 U.S.C. §§ 107(b), (c). Although some courts have suggested that expungement orders are authorized under 11 U.S.C. § 107(b), *see, e.g., Joyce*, 399 B.R. at 386 n.2, the Court need not reach that question because, as discussed *infra* Sec. B.2., Ms. Chapman does not meet the requirements to warrant protection under § 107(b).

employment "because of the reputational taint associated with the public record of his indictment and arrest," or a defendant's post-judgment good behavior. *Id.* at 302. Ms. Chapman's struggles with obtaining credit after the dismissal of her three bankruptcy cases and her resulting sense of embarrassment and loss of dignity (as well as any other equitable reasons that might call for expungement) are, like the collateral facts described in *Wahi*, circumstances that arose outside of the bankruptcy cases.[5]

Second, the *Wahi* court explained that the power to expunge on equitable grounds does not affect the court's ability to function successfully as a court:

> Equitable expungement is not needed to enable the court to "manage its proceedings" for the simple reason that the criminal proceedings are over. Nor is expungement authority needed to enable the court to "vindicate its authority" or "effectuate its decrees." Expungement is not a remedial tool to enforce a ruling in the underlying criminal case. In short, equitable expungement "is in no way essential to the conduct of federal-court business."

*Wahi*, 850 F.3d at 302 (internal citations to *Kokkonen* omitted).

For the same reasons, this Court's "inherent equitable power" derived from 11 U.S.C. § 105(a) is an insufficient basis, standing alone, to confer jurisdiction to expunge Ms. Chapman's three bankruptcy cases.

### 2.    Sealing Records Is Not Warranted

If expungement is not granted here, Ms. Chapman makes the alternative request that the Court permanently seal her case records. ECF Doc. No. 52, at

---

[5] While the Court may have original jurisdiction to determine the validity of a petition, *see In re Hurt*, 234 B.R. 1, n.1 (Bankr. D.N.H. 1999), this Court has determined the Chapman petitions to be valid pursuant to the durable power of attorney.

7–8. This request is rooted in the Court's statutory powers conferred by 11 U.S.C. § 107.

Under 11 U.S.C. § 107(a), all papers filed in bankruptcy cases and the dockets of bankruptcy courts are public records subject to examination by members of the public. Filing for bankruptcy is a public act. *In re Joyce*, 399 B.R. 382, 385 (Bankr. D. Del. 2009) (citing *2 Collier on Bankruptcy* ¶ 107.02 (15th ed. 2008). A court's ability to limit that public examination is circumscribed under 11 U.S.C. §§ 107(b) and (c), and Fed. R. Bankr. P. 9018.

Section 107(b) of the Bankruptcy Code, on which Ms. Chapman relies, provides limited authority to seal bankruptcy records:

> On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—
>
> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or
>
> (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

Bankruptcy Rule 9018 sets the procedure for invoking the court's power under § 107(b):

> On motion or on its own initiative, with or without notice, the court may make any order which justice requires . . . to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code, . . .

Ms. Chapman contends that the bankruptcy cases initiated by her daughter, under the auspices of her POA but without Ms. Chapman's contemporaneous knowledge, are "scandalous or defamatory matter" that should be permanently sealed, and that such action will mitigate the damage to

her credit profile. In support, Ms. Chapman cites *In re Phar-Mor, Inc.*, 191 B.R. 675 (Bankr. N.D. Ohio 1995). In *Phar-Mor*, the defendants in an adversary proceeding sought to have a complaint permanently sealed, arguing that the allegations against them were untrue. 191 B.R. at 678. The court explained that "[b]ecause Congress enacted an express statutory scheme, issues concerning public disclosure of documents in bankruptcy cases should be resolved under § 107. . . . The discretion lies not in whether a court may protect an interested party, but in whether the matters complained of fall within the exception and in what type of protective remedy is necessary under the facts of each case." 191 B.R at 679. In assessing whether the allegations were "scandalous or defamatory," the *Phar-Mor* court considered whether reasonable persons could alter their opinion of defendants based on the statements, taking them in context. *Id.* It answered 'yes,' because the complaint contained allegations of wrongdoing by the defendants for acts of another, without an explanation. *Id.* at 679–680. The court thus found that the defendants were entitled to protection and assessed the degree of protection needed. *Id.* at 680. It was unable to take the least restrictive step, redacting defendants' names from the complaint, and so it gave the plaintiff thirty days to withdraw the complaint, before taking further action. *Id.*

Another case cited by Ms. Chapman is *Gitto v. Worcester Tel. & Gazette Corp. (In re Gitto Global Corp.)*, 422 F.3d 1 (1st Cir. 2005). In that case, the court expanded on *Phar-Mor*, by establishing a standard for proving whether

the material would cause a reasonable person to alter his or her opinions: (1) if the material is untrue, or (2) the material is potentially untrue and irrelevant or included within a bankruptcy filing for an improper end. *Id.* at 14. The movants in *Gitto* were the former CEO of the debtor-company, and his father, seeking to seal a report generated by a court-appointed examiner. *Id.* at 15. They offered no proof that the material in the report was inaccurate or untrue, so the court considered the second standard. *Id.* The court found that while the material could be potentially untrue, it was not irrelevant—as it was the information the court asked the examiner to investigate—and it was not filed for improper means—as the examiner was a disinterested party and there was no indication of bad faith. *Id.* at 15–16. There was no basis to seal.

The test established by *Gitto* was employed in another case, *In re Neal*, 461 F.3d 1048 (8th Cir. 2006). In *Neal*, the debtor asserted that a creditor list was "scandalous" because she had been a judge, and her creditors were lawyers who had lent her money. The appellate court disagreed, holding that the creditor list was not untrue and reasoning that "[p]otential scandal only surfaces when one looks 'outside the lines' of the bankruptcy proceeding, looks outside the context of this bankruptcy filing, and speculates as to the motives of the creditor and the debtor." *Id.* at 1054. Further, the creditor list was required to be filed under the Bankruptcy Code, and there was "no allegation that the list . . . was filed for an improper purpose, such as to gratify public spite or promote public scandal." *Id.*

Here, the Court cannot conclude that Ms. Chapman's bankruptcy filings are "scandalous" or "defamatory," and thereby subject to the protection of § 107(b). Each of the three cases reflect that they were initiated by Ms. Chapman's attorney-in-fact, under a duly executed and unrevoked durable power of attorney. The filings themselves are not "untrue." Ms. Chapman does not point to any specific false information contained therein, which would be subject to protection. Even if the Court could overlook the truth of the filings, there is no indication that they were filed for an irrelevant or improper purpose; all three cases post-date the foreclosure action initiated by the Bank. Each year hundreds, if not thousands, of debtors file a bankruptcy case for the good faith purpose of trying to save their homes. *See In re Fazzary*, 530 B.R. 903, 907 (Bankr. M.D. Fla. 2015) (explaining that a central purpose of Chapter 13 bankruptcy is to save homes); *In re Gibas*, 543 B.R. 570, 598 (Bankr. E.D. Wis. 2016) (filing for bankruptcy to save one's home from foreclosure can be a valid and proper use of the Bankruptcy Code).

Ms. Chapman's concern that creditors will see three bankruptcy cases filed in her name in the span of eight months and surmise an effort to mistreat creditors does not alter the Court's inquiry under § 107(b). Such a concern is "looking outside the lines" and speculation as to motives, conduct which does not make the filings themselves "scandalous" or "defamatory." *See In re Neal, supra.* Indeed, bankruptcy courts invoking § 107(b) have routinely held that authorized or knowing filings do not constitute "scandalous or defamatory"

material based solely on repercussions or potential repercussions. *See*, *e.g.*, *In re Whitener*, 57 B.R. 707 (Bankr. E.D. Va. 1986); *In re Henry*, Case No. 17-36854, 2019 WL 623873 (Bankr. S.D. Tex. 2019); *In re Joyce*, 399 B.R. 382, 385 (Bankr. D. Del. 2009).

In *Whitener*, for example, the debtor received his Chapter 7 discharge in 1980, but then voluntarily repaid all of his creditors by 1985. 57 B.R. at 708. He requested that the court seal his bankruptcy record, because having paid his pre-petition debts in full, he felt the bankruptcy records were misleading to credit agencies. *Id.* The court declined to seal the petition because "[i]t is undisputed that the information in the . . . case is true. The dissemination of truthful matter cannot be enjoined merely because the matter is prejudicial." *Id.* at 709. *See also In re Creighton*, 490 B.R. 240, 245 (Bankr. N.D. Ohio 2013) (mere filing of bankruptcy was not "scandalous" even if debtor was subject to ridicule at work and in community due to knowledge of her filing, even effect on her mental health was not caused by public access to information but by the way some people had used that information).

Because the case filings themselves are not scandalous or defamatory, this ends the Court's inquiry under § 107(b), and forecloses Ms. Chapman's request to seal.

### 3. Annotating the Record Is Not Warranted

Some bankruptcy courts, rather than expunging or sealing, have found a middle ground to grant relief in certain circumstances. *In re Buppelman*

considered statutory authority for expungement, decided that it falls under neither § 105 nor § 107(b), and yet went on to afford some relief without identifying a specific statutory basis for the relief. 269 B.R. at 341. Two unrelated debtors asked that their cases be expunged. *Id.* The first, Mr. Buppelman, had given his lawyer a list of his and his wife's creditors, but later instructed him not to pursue the bankruptcy. *Id.* at 342. Nonetheless, the lawyer filed a bankruptcy case, forging the clients' signatures. *Id.* The case ultimately was dismissed because the debtor failed to appear at the 341 meeting. *Id.* In the second instance, Mr. Fountain gave a debt-negotiation company a signed bankruptcy petition, but with the understanding it was part of workout negotiations and would be filed only "'as last resort." *Id.* The company filed the petition, and later Fountain's case was dismissed for failure to file schedules. *Id.*

The *Buppelman* court considered that debtor Fountain could not establish fraud by virtue of having signed the petition but never revoking the agent's authority to file it. *Id.* Consequently, the court declined to allow any relief "for a poor choice of workout alternatives." *Id.* at 343. In contrast, Mr. Buppelman had stated specifically that his lawyer was not to file the bankruptcy case, yet the lawyer disregarded the instruction. The court therefore concluded the situation surrounding the fraud warranted a remedy. Potential remedies included (1) expungement and destruction of all case documents, (2) making a notation on the docket to indicate that the

bankruptcy filing was fraudulent and not authorized by the named debtor, or (3) directing the Clerk to delete references to debtor's name on case dockets. *Id.*

The *Buppelman* court opted for the second approach, and made a notation that the dismissed case was the result of fraud committed by a party other than the debtor *Id.* This notation would sufficiently apprise any creditor or other agency interested who checked the docket. *Id.*

The court in *In re Joyce* adopted and expanded the *Buppelman* equitable remedy for unauthorized filings, and discussed an additional option, to declare the bankruptcy filing "null and void" by:

> entering an order declaring the debtor's bankruptcy "null and void" and noting that '[t]his order by its terms will have the same effect as though the debtor had never filed his petition. Thus, although the [debtor's] bankruptcy file will remain open to the public, the ['null and void'] order will serve to grant" the expungement relief sought.

*In re Joyce*, 399 B.R. 382 at 385 (citing *In re Whitener*, 57 B.R. 707). The *Joyce* court did not identify a specific statutory basis for this remedy.

As the *Joyce* court explained, the main difference between expunging and declaring a bankruptcy filing "null and void" is that the former conclusively "wipes the slate clean of any reference to the filing" such that a person can answer "no" to the question "have you ever filed for bankruptcy?" *In re Joyce*, 399 B.R. at 386 (citing Peter C. Alexander, *Identity Theft And Bankruptcy Expungement*, 77 Am. Bankr. L.J. 409, 412 (2003)). In contrast, a "null and void" declaration simply requires the court to annotate the record to alert interested parties that a particular bankruptcy filing should be disregarded for

one reason or another; there is no requirement that an entity actually disregard the information or that credit reporting agencies remove the bankruptcy filing data from the person's credit report. The *Joyce* court likened this approach to making a notation as used in *Buppelman. Id.* Despite recognizing such a remedy, the *Joyce* court declined to apply it because the debtor had voluntarily initiated the petition, and despite his claim of "identity theft," all debts listed in his schedules had been incurred by him personally. *Id.* at 388.

In another case, the court considered whether expungement was proper under § 105 or § 107(b), but declined to answer the question. The court in *In re Dick,* 2006 WL 6544157 (Bankr. N.D. Tex., May 19, 2006), used the middle ground remedy of making a docket notation, without identifying express statutory authority. There, the debtor asserted that the bankruptcy petition filed in her name was forged, and she was the victim of identity theft. *Id.* Ms. Dick testified that her former boyfriend had a key to her condominium, checked her mail, and had access to her financial information. *Id.* at *2. He offered, and she agreed, to pay her mortgage. *Id.* But at some point, he fell behind on the payments and took the mail that would have alerted her to the payment default. *Id.* She did not have proof that the boyfriend had filed the bankruptcy case using her name, but testified that he was the only person who may have had access to the information necessary to file. *Id.* The *Dick* court found her credible, and further discovered that the Clerk's office—in its ordinary course—had a copy of the driver's license and social security card of

the person who filed the petition, which confirmed that the former boyfriend had filed the petition. *Id.*

The court concluded that directing the Clerk of Court to "flag" the case with a publicly and prominently viewable notation "Unauthorized Bankruptcy Filing—Identity Theft Victim" was the better resolution than expunging under § 105 or sealing pursuant to § 107(b).

All of the cases discussed immediately above and cited by Ms. Chapman pre-date the Seventh Circuit's decision in *Wahi*, 850 F.3d 296. To the extent that *Wahi* does not restrict this Court's jurisdiction to order Ms. Chapman's petitions be marked "null and void,"[6] the Court nonetheless finds Ms. Chapman's circumstances do not warrant such action.

Ms. Chapman's counsel argues that her client is "a victim of abuse," that Holly financially abused her mother, breached her fiduciary duties, and "covered up the malfeasance as long as she could." ECF Doc. No. 52, at 6, 10. Counsel asserts that because the harm to Ms. Chapman has been "caused directly and specifically because of [Holly's] abuse of the bankruptcy system[, it] can only meaningfully be remedied by the bankruptcy court." *Id.*

Holly stopped making the mortgage payments to Nicolet National Bank, at least as early as October 2017. It appears that the receipts Holly gave her

---

[6] *See also In re Woods*, No. 05-32207, 2007 WL 1306427, at *1 (Bankr. W.D. Mo. May 1, 2007) ("Without a statutory anchor in the Bankruptcy Code, this Court does not believe it has the authority to declare voluntary bankruptcy petitions 'null and void.'").

mother were doctored. Ms. Chapman testified that although she kept them in a file, she did not look at the receipts, she did not look at her account balances, she did not collect the mail, and she relied on Holly for all financial and home management.

In that same time frame, the Bank instituted foreclosure before Holly began bankruptcy proceedings in her mother's name. It will never be known whether Ms. Chapman could have worked with the Bank (and perhaps her son, Brad) to save her home if she had been alerted earlier to those missed payments. Unlike the purported debtors in *Buppelmann*, and *Dick*, however, Ms. Chapman was not a victim of identity theft—Holly did have authorization to take financial actions on behalf of her mother. Any breach of fiduciary duties by Holly is a state court matter.

**C.      Chapman Proposes Additional Protections When an Agent-in-Fact Files a Petition on Behalf of a Debtor.**

In further support of her request for relief, Ms. Chapman's counsel argues there should have been additional procedures in place, either taken by the bankruptcy counsel whom Holly Olm approached, or by the Court itself, to discern quickly that an agent-in-fact had filed these cases, and that notice should have been mailed to the debtor. *See* ECF Doc. No. 52 at 3–5. Specifically, she suggests adopting the requirements set forth in *In re Hurt*, 234

B.R. 1 (Bankr. D.N.H. 1999):[7] that (1) the initial petition (often called a bare-bones or "emergency" filing) be "properly executed by the attorney-in-fact" to reflect the representative capacity, as opposed to the typical electronic signature of the debtor's name, (2) that a copy of the POA document be filed with the petition, (3) that the agent appear at the first meeting of creditors to describe his or her role, and (4) that a copy of the Notice of Commencement of Bankruptcy be mailed to the debtor's current address. *Id.* Ms. Chapman's counsel argues that these protective procedures could not occur here because the Court was not aware the petitions were filed by an agent, the POA document was not filed, and the electronic signature was that of the principal. *Id.* Moreover, she asserts the Court and the Chapter 13 trustee were not on notice of the POA until Holly, through counsel, filed the Plan signed in her representative capacity or appeared at the 341 meeting. *Id.*; *see* Case No. 18-30442-beh, ECF Doc. No. 13, at 11; Case No. 19-22820-beh, ECF Doc. No. 13, at 11.

While neither the Federal Rules of Bankruptcy Procedure nor this District's local rules prescribe everything Ms. Chapman's counsel suggests, it is

---

[7] The *Hurt* court, in turn, cites to *In re Brown*, 163 B.R. 596, 598 (Bankr. N.D. Fla. 1993) and *In re Harrison*, 158 B.R. 246, 248 (Bankr. M.D. Fla. 1993) as requiring petitions signed without indicating a representative capacity to be deemed a legal nullity and to *In re Ballard*, Case No. I-87-00718, 1987 WL 191320 (Bankr. N.D. Cal. April 30, 1987) as requiring the Clerk to mail a notice to the named debtor. 234 B.R. 2–3; *see also U.S. v. Spurlin*, 664 F.3d at 959 (adopting the *Ballard* rule).

unlikely that any new steps would have made a difference here.[8] The record reflects that Holly Olm provided a copy of the POA to both bankruptcy counsel, and consequently the first lawyer proceeded to file two cases and the second lawyer filed one case. The Chapter 13 trustee also received a copy of the POA in the first case and was free to inquire about it at the 341 meeting. Further, the dockets in all three bankruptcy cases indicated the existence of a POA shortly after their initial filings. In short, these cases were authorized when filed, and Ms. Chapman was on the service list. The breakdown of her relationship with her daughter is tragic, but not something the bankruptcy court can mend.

## CONCLUSION AND ORDER

For the foregoing reasons, the Court's equitable powers under 11 U.S.C. § 105 do not authorize the Court to equitably expunge Ms. Chapman's bankruptcy cases. In addition, because Ms. Chapman executed a durable power of attorney which authorized her attorney-in-fact, Holly Olm, to institute bankruptcy proceedings, and because she never formally revoked that authority, the Court cannot conclude that the filing of cases 18-30442-beh, 19-

---

[8] The Court agrees, however, that it may be the better practice to require an attorney-in-fact commencing a case on behalf of another to sign the petition in a manner that reflects the signer's representative capacity, or to take the other precautionary measures as described in *Hurt* and the cases cited therein. *See also In re Nakano,* 2019 WL 2896199, at *12–15 (Bankr. C.D. Cal. June 26, 2019) (relying on *Ballard*, *Spurlin*, and *In re Matthews*, 516 B.R. 99 (Bankr. N.D. Tex. 2014) and describing the need for a "failsafe to prevent abuse where a bankruptcy case is filed for another individual through the use of a power of attorney and that there needs to be some evidence that the [d]ebtor was informed about the bankruptcy case and consented . . .").

22820-beh, and 19-26731-beh were unauthorized. Consequently, there is no basis for sealing or annotation of the record.

Accordingly, the debtor's motion to expunge/seal is **DENIED**.

**It is so Ordered.**

Dated: March 26, 2021

By the Court:

Beth E. Hanan
United States Bankruptcy Judge